Christopher Mann on behalf of the appellants, Atel Maritime Investors, Maritime Investors III, and Calacane, LLC. I will refer to them collectively as Atel throughout the argument. Your Honor, despite the size of the record in this case, in reality, this is a very simple case. They're all simple. Yes, and hopefully this one more so than normal. Not that last one. I think I'll agree, Judge. This is a hidden profits case. That's what we're dealing with right now. The two defendants, in this case Sea Mar Management and Neighbors Well Services, these are two integrated companies with common origin and operating for a single purpose. They worked in concert to deprive Atel of nearly $3 million in revenues that were earned by the Atel vessels and which rightfully belonged to Atel. A lot of the facts in this case are not in dispute. At the outset of this arrangement between Atel and Sea Mar Management, Sea Mar Management did exactly what they were required to do. They reported every single dollar in revenues earned by these vessels and turned all of those dollars over to Atel. That's what they were contracted to do. And then something changed. And what changed is the CEO of Neighbors Industries Limited, who's no longer a party but the ultimate parent company, came in and asked and told Neighbors Well Services to confect a way to steal, if in effect, but to take and deprive Atel of 10% off the top of every single charter that was entered into. Not only were these activities by Neighbors Well Services and, through default, Sea Mar Management, in clear breach of the controlling contract, it was in contravention of general maritime law as well. Were you ever able, your client ever able to make this much money before or after this contract for these vessels? This was, Atel is not in the business of managing vessels. They are an investment company in different areas. This was their first foray, if you will, into managing of vessels. They manage rail car, not manage, I'm sorry. They own and then hire managers for rail cars as one of their industries. So this, and there's no doubt, Your Honor, that Atel made a lot of money off of this deal. It was a very profitable arrangement for Atel. But the reality is it should have been 10% more profitable. But to answer my question, after you dumped these people, did you make the same amount of money or more with someone else? No, we did not, Your Honor. And as the testimony showed, the market changed. Yeah, the market turned around. A fair assessment about what happened. During the majority of the time, this was right in the aftermath of Hurricane Katrina. These are oil field service vessels, supply vessels. And the market for these, as the testimony was, was exploded. So the point is fair, Your Honor, that the market was, the money was down, but so was the market. And so during the entire- But I thought they were also just not well utilized after you stopped using these people. Correct, Your Honor, but the market- Not just at any price. They were, right, the market- In other words, they were busy when you had CMAR working with you and then they kind of tanked after you got rid of them. And both in terms of profits and utilization. Correct, Your Honor. But you're saying that's entirely due to market downturn and other factors. I certainly believe that it be the case, but I would also state that ATL has never challenged the utilization rate of the vessels during CMAR's management of them. In fact, ATL acknowledges that the utilization rate was quite good. But the reality is that despite that, it was good efforts on CMAR management's part, that the actions concerted between CMAR management through Neighbors Wealth Services resulted in 10% of the money being taken, unbeknownst to ATL, and without any additional services- Well, actually, one of the problems that you've got here is you're kind of hung up on your own contract. Because you agreed that what they were going to do for you is limited to marketing services as they are generally performed by CMAR, right? And the problem was that you didn't investigate to find out how it was that they did that.  First of all, the marketing provision that you refer to was a catch-all provision in Section 3J, which outlined all of the different obligations that CMAR had. The last one being the catch-all, which did state, yes, marketing is generally performed. But I think the most important part is that ATL certainly believes they did do proper due diligence. But I think looking at what actually transpired, that at the outset of this arrangement, nothing had changed. At the very beginning, CMAR management was marketing the vessels through Neighbors Wealth Service. But 100% of the revenues were being reported to ATL. All of the invoices were coming from CMAR management, as required by the explicit terms of the contract. So the only thing that changed was that Neighbors Wealth Services, at the direction from On High, said, we need to find a way to make more money. So, to your point, Your Honor, the marketing, which ATL was paying for, I think it's a critical part. The part of the management fee that ATL was paying CMAR included a number of things. But it specifically included marketing of the vessels. And what occurred here was, and of course ATL did pay CMAR a total of, I think, around $1.6 million over the course of this contract. But what in effect occurred is, since the marketing activities were actually done by a related company, Neighbors Wealth Services, to the tune of nearly $3 million, ATL ended up paying, in effect, twice for the same exact services. The district court said, looked at this Article 13, which said, well, CMAR could do this because marketing could be another service that could be performed by an affiliated company. That is a fallacy. Are you saying they paid twice because the service was subcontracted out? Correct, Your Honor. ATL's beef is not that, first of all, CMAR definitely represented that they could market the vessels. That was the representation that CMAR made to ATL. I'm having trouble making that connection. Of course. You've got to help me. Go slow. Sure. Tell me how it is that they paid twice just because of subcontracting. Yes, Your Honor. I equate this to a general contractor scenario. CMAR here is a general contractor. They contractually bound themselves to perform top-to-bottom vessel operating services. Everything from operating, crewing, repairing, and marketing, finding time charters for the vessels. And for that, ATL paid consideration. If CMAR management had to, for whatever reason, valid or invalid, go to a third party to perform one of those services, that's not the issue. The issue is that those additional services were, in effect, charged back to ATL. That's the akin of a general contractor who agrees to build your house top-to-bottom for a set price. All of a sudden, at the end, comes in and says, oh, here's the bill for the plumber for additional attention. But didn't your agreement recognize that that could occur? The agreement? I mean, weren't there a list of people? That's a little bit of a distinction, Your Honor. The list, Schedule II, which I believe you're referring to. Yes. Schedule II was a list of companies, marine companies, that CMAR management was allowed to go sub-charter to without obtaining pre-approval from ATL. These are companies that were, during the contract negotiations, were vetted by ATL for creditworthiness. Well, ATL, at least at that point, recognized there could be some sub-charter. Absolutely, Your Honor. And I think that's where a lot of this confusion at the district court level came in. There is no dispute that sub-chartering was allowed under this Master Baybrook Charter Agreement. That was the sole purpose of it, was for CMAR management to find sub-charters for these vessels. The problem comes in is that the general maritime law and the plain language of this contract qualified CMAR management's ability to go out and sub-charter. And specifically, first of all, the general maritime law clearly states that a sub-charter has to follow the terms of the head charter. It cannot violate the terms of the head charter. That provision, general maritime law provision, was clearly backed up, and I'll quote from it, Section 3B of the Charter Agreement. Any time charter shall be in compliance with all terms and conditions of this charter. So, what ended up happening is, when CMAR management contracted with Neighbors Well Services, that sub-contract, that time charter agreement, did not comply with the terms of the Master Baybrook Charter Agreement between ATEL and CMAR in a number of very important respects. The Section 8B of the Master Baybrook Charter Agreement provided that any and all time charters or other contractual relationships entered into with respect to the use of the vessels shall be in the name of CMAR. Any and all time charters. That was an express limitation on further sub-chartering of the vessels. The District Court completely overlooked that. Completely overlooked that. Secondly, Your Honors, Section 8A. CMAR will be responsible for and agrees to collect all time charter hire and other revenues earned from the operation of the vessels. All time charter hire. Not all time charter hire that CMAR enters into. All time charter hire. Again, by entering into this time charter agreement with Neighbors Well Services, which allowed Neighbors Well Services to collect everything, not only was that the facility which allowed Neighbors Well Services to skim this 10%, it expressly, I'm sorry, breached the express language in the controlling contract between ATEL and CMAR. Section 8D of the Master Baybrook Charter Agreement. All accounts receivable arising from the time chartering of the vessels shall be remitted to CMAR. Irrespective of whether the invoice for the charter hire or related expenses is issued in the name of CMAR. That's exactly what happened here. CMAR wants to take the position, well, Neighbors Well Services, they did the invoicing, we didn't know. Well, under the plain language of the contract, no matter whose name the invoices were issued under, CMAR was responsible for collecting all accounts receivable and remitting those dollars to ATEL. That didn't occur in this case. And that's where the damages occurred. Let me ask you about some other things that haven't come up yet. Yes, Your Honor. What difference does it make in this case if we apply single business enterprise versus a general alter ego theory? I frankly don't think it makes much of a difference at all. Okay. What duty to disclose did CMAR or Neighbors have to ATEL? Under the contract, Your Honor, between CMAR and, I'm sorry, ATEL and CMAR, CMAR had significant duties to disclose. They had duties to disclose all revenues earned by the vessels, all charters that were entered into with respect to the vessels, all expenses pertaining to the vessels. So CMAR had that expressed contractual obligation. And then you add on to it that pursuant to the Master Bear Boat Charter Agreement, CMAR was in effect acting as the agent for ATEL in going out and finding work, finding subcharters for these vessels. And as ATEL's agent, CMAR also had a duty to disclose if its vessels, ATEL's vessels, were earning more money. And the testimony at trial showed that Darryl Plazon, who was the vice president essentially of operations at CMAR Management, he heard from Neighbors Well Services that they were going to be implementing this scheme, the 10 percent scheme. He objected to it at a board of managers meeting. He noticed, started getting forms with a higher rate being charged by Neighbors Well Services. When Darryl Plazon, who was CMAR Management, questioned that rate, all of a sudden the forms he started getting from Neighbors Well Services had the charter rates blacked out. At that point, if not before, Darryl Plazon, CMAR Management, had a duty to disclose what was transpiring with Neighbors Well Services. And I understand the contractual argument. Yes. You're saying that because they were, in your view, an agent, then that gives them a fiduciary duty? Yes, Your Honor. And that's where the duty is disclosed? All right. What about Neighbors Well? It doesn't have an express contract. Correct. It's not an agent. So where is its duty to disclose coming from? That comes from the role of Van De Witt. Van De Witt, who was the president of the CMAR division of Neighbors Well Services, he was also on the board of managers of the owner of CMAR. Van De Witt, and the record shows that he testified at trial, that he attended the operational meetings, the board meetings, for CMAR Management. He was the one that had direct input into what was taking place with CMAR Management. So here you have Van De Witt as the president of Neighbors Well Services, who is wearing multiple hats, and he's trying to claim that even though he knew and even directed that this take place, as far as the skimming, that he did not inform, through his board role, the CMAR Management, of disclosing this to HL. It was a specific intent. How does that give Neighbors a duty to disclose, a legal duty to disclose? I acknowledge, Your Honor, that that is a weaker point, especially since there's no contractual link between them. I acknowledge that. But if you look at what his, again, this individual's role, who was, again, wearing multiple hats and sitting in front of chairs. He's not a defendant here, is he? No, he's not, Your Honor. Then let me ask one other thing, which goes to this issue of kind of after the fact, he didn't do as well in utilizing these boats and all of that. The argument you're making, I understand the contract, but on the fraud and nondisclosure and all that, is if we'd known, we would have yanked the contract, and we would have done great on our own. Is there any evidence you would have done great on your own? That's really what my point was earlier. The evidence of record, Your Honor, was of their own expert on Evanne DeWitt, who said that during the time frame that this entire arrangement was in place, that the market was exploding. So while there's no specific direct evidence as far as a second management company, what that second management company would have been able to do, there is evidence of record of what the market was during this entire time frame. And there's no testimony that, either from their expert or others, that what CMR management was doing couldn't have been done by others. But your best argument has to be, though, that you were entitled to the money. Correct. Not that if I had known, I would have done something else, and then I would have gotten it. I understand that's an alternative argument. You are absolutely correct. That's not your best argument. I agree, Your Honor. All right. Thank you very much. All right. Is there time for a vote? Yes, thank you. May it please the Court, Thomas Smith for CMR Management and Neighbors Wealth Services. If I may start at the end a bit there about the damages, the evidence is clear that they did not, and they did not establish this to the judge's satisfaction, the trier of fact, that there was any damages as a result of any of this. It's as simple as that. The rest of their case fails. We can go into it, and I will, in a little bit more detail. Okay. That's what I was trying to get at. It seems to me that they have an argument, we should have gotten that 10 percent. So that's one argument. Okay. But then the other argument is if we had been told, that's a contractual argument. The fraud argument is if you told us the truth from the start, we wouldn't have done the deal with you or we would have yanked the deal from you. And then they have to show they would have gotten that 10 percent from somebody else, not recovering the 10 percent from these guys. And that's my question. Do they have any evidence of that? Because it sounds like the judge doesn't think they did. And they do not on that point, Your Honor. The reason they do not is because the only expert in this case was retained on behalf of CMR Management and Neighbors Wealth Services. Mr. Campo. He testified specifically that the type of work that was done by Neighbors Wealth Services, the service provided, was what is traditionally, that the rate of pay for that, the rate of compensation is in the 10 percent range. The fact that there was a lot of activity after Katrina is significant and interesting, but there is no other testimony about what the rates would have been. And I might add that what you don't hear as they talk about this explosion of activity is that when they were working through CMR Management and then Neighbors Wealth Services was in its job of going out and finding the business for them and then paying what it agreed to pay, their utilization rate was 90 percent plus. Neighbors has to get out of the business because of changes in the law. So they get out of the business, they have to sell the boats. They sell them to a company called Hornbeck. They go to Hornbeck with the exact same player, Mr. Plazance, who supposedly is a bad actor in this case. He goes over there and their utilization rate drops off to practically nothing because Hornbeck can't make any money. They don't have any way to make any money by marketing the vessels. So they move to another company called Gulfmark, again with Mr. Plazance, the bad actor. They follow him around. Again, terrible utilization. They get tired of that. Now they go to BMAR. This time it's Mr. Plazance and there's Mr. Van De Witt. The same guys they say are so bad throughout the whole course of this, they're following them around and getting very little in the way of any kind of activity or utilization. If you want to say it's all because it blew up after Katrina, then you don't explain how day last when you're with us, you're at 90 percent. As soon as those contracts run out, you're at practically nothing. There's nothing that happened in that week or 30 days that changed that much. So your position is they rise and fall on the contractual argument that we're entitled to the 10 percent under the contract because otherwise they really can't prove damages on this fraud theory or any of these other theories, even if they could prove liability. I agree with you, which means that Neighborhood Oil Services, which is not any part of any contract, does not have any liability in this case. So why don't you answer the contractual argument that there's a lot of stuff you all messed up, this invoicing and this and that, you didn't disclose this, you didn't meet the master service contract and so on and so forth. Why don't all of those provide some degree of relief? Well, the best answer to that is because the judge took a look at it and decided with respect to the various provisions, the district court judge who heard the witnesses, weighed the evidence, had the best opportunity to see all that, decided, amongst other things, that Mr. Plaisance, who was a big part of their case as to what we, as our management, did or didn't do, that it was a biased witness and she didn't give his testimony much weight. The other part, of course, is that she looked at the various provisions and said, under the contract, because this was as the work was generally performed, and this is Mr. Murray here, as Mr. Murray did not find out exactly how we marketed as we generally did, and neither did anybody else from CMR, Mr., his name is Tom Monroe, Mr. Monroe came to visit us on one occasion, they say two, but I can only find one on the record, but whether it's one or two occasions, they came to visit CMR, and he never did figure out exactly how we marketed. He thought, because Mr. Plaisance seemed friendly with decision makers, and I think that's the quote out of his testimony, seemed friendly with decision makers, apparently he was the guy that was doing the marketing. All along, CMR had marketed its vessels through Neighbors Well Services. Whether they were Neighbors vessels that had to be owned by Neighbors Finance because the law required that, or whether they were ATELS vessels, none of that changed. Those were the facts, and they remained unchanged. So when the contract says we can do it, and that's the way we do it, and Neighbors Well Services was making money when they were out there marketing Neighbors vessels, they were making money when they were out there marketing vessels for our friends at ATEL. ATEL made an awful lot of money that they didn't make after that. Now let's talk a little bit about the rates they actually, well, my point, back to the damages even under the contract, they got paid the rates that were commercially reasonable rates. They want to make a big argument out of whatever it was that Neighbors Well Services was able to negotiate. They could negotiate that because they had the commercial relationships. They had the master service agreements with the oil companies. They were the ones that could go out there and market these vessels. They had a valuable service that they were providing. They were entitled to be paid for it. It's industry custom and usage. There's nothing wrong with that. And the testimony shows that there was no communication between Neighbors Well Services and CMR Management where CMR Management actually was aware of what Neighbors Well Services was charging. They had suspicions, but they didn't have actual information. Does that matter? I believe it. Well, not vis-a-vis, well, on two counts, I believe it does. On the contract, I don't see how it does. Well, it doesn't matter. You either have a duty to account for these 10% or you don't. And if you do, you have to pay 10%. Well, I would say you have to. I cut you off. Well, I mean, to me, the contract isn't all this stuff about what's in people's hearts.  but I don't see how it goes to the contract. The contract requires what it requires. Whether you had a good or bad heart. Well, but you have to have knowledge. If you're telling me I need to know about this, you have to establish that I knew or should have known. I've got to report what I know. If I'm CMR Management, what I know is I get a phone call from, and this is the testimony, I get a call from Neighbors Well Services saying we can put one of the ATEL, Colichine, Kane, or whatever, to work at $10,000 a day just to pull a number out of the air. Will, will you take that? And if it was a lower number than they had before, they would call back to San Francisco and talk to the folks at ATEL and say, this is what they're offering, is that good for you? If it was the same or higher number, sometimes they did, sometimes they didn't. But that's what they knew. How are they supposed to go out? You think Neighbors is working for free? I mean, that seems completely inconsistent with your whole argument. No, I don't think they knew that. They don't have a real, I'm not sure that they had an understanding, necessarily, of exactly what Neighbors was doing, per se, because they never bothered to find out how we traditionally, or how we generally marketed our vessels. I'm not sure they understood that. I was going to say ATEL. ATEL, I apologize. CMR knew, though. Well, CMR... That's my point. I don't understand. I really don't understand this. This seems like you're going down a path that you can't really win. Well, was CMR aware that Neighbors was working for nothing? Is that the question? I did not think your argument rested on the notion that CMR thought Neighbors was working for free. Maybe I misunderstood. I thought your argument was, the contract didn't require you to account for what Neighbors was making off of it. It's making a percentage off of what it's sort of chartering for CMR for ATEL. I'm not... No, ma'am. I think that, with respect to the contract, that there were various provisions within the contract that required reporting, and counsel was accurate in that regard. I'm not arguing that that was what was in there. To a certain extent, I'm saying, well, CMR management know what or to whether... Whether and to what extent, because Neighbors didn't believe they needed to disclose it, so they didn't know whether and to what extent Neighbors... That is CMR, didn't know whether and to what extent Neighbors was actually charging. Okay? And alternatively, that... I look to the district court's ruling on this, which is, look, they're not damaged by this. Even... There's two things. Had they known they wanted to terminate it, they would have had nowhere to go to make this, and there's no evidence they would have. All right? So they... There were no damages on that part, and there are no damages because the judge said they could have done it, and it was an other service they could have charged for. And am I to understand to you that, under the facts as developed, ATEL would get a call when there was an inquiry from an end user, and then ATEL would approve a rate? Like, they'd call up CMR, and CMR would call ATEL, and Neighbors called CMR and says, We have an interested... Whatever you call it. Customer or charterer. That's our customer. They had a charterer, right. And this is what they're willing to pay, and CMR would then call ATEL? Generally speaking, that's correct. Sometimes they wouldn't have to if it was already a situation where they had worked with the same customer before, and the rate was at or above that. But if the rate was down, they generally would make a call. And then there were other times they would make a call. According to testimony, even if CMR went ahead and entered the contract, usually within a week or so, they would call back to ATEL and say, Here's what's going on. So they would have... Your description is exactly accurate. It would be a phone call from Neighbors Wells Service to CMR. CMR would decide whether they could accept it based on what they knew already, or they had to make a phone call. And even if they accepted it, they would then call back to ATEL at some point. And ATEL always approved the rates. There's no evidence that ATEL wasn't satisfied with the rates, and they were checking those rates. And it's probably my oversimplification of it, but if I go in a consignment store to buy cuff links and the price on the cuff links is $20, and I tell the person behind the counter I'm willing to pay $10 for these, and they say, Well, the owner told me they were worth $20. Let me make a phone call. The owner says, I'll take $10. The owner's satisfied. They got what they wanted. I agree with that from a damage perspective, again. Now, whether or not somebody else got an extra $5 out of the deal between the person in the store and what it ultimately gets up to the person who owns the cuff links in consignment may be a different number. Yes. I agree with you. That's correct. Okay. Was Seymour ATEL's agent? Because it does matter if a fiduciary is making an undisclosed profit. Was Seymour. I don't believe that. They had obligations under the contract. I'm not sure it gave rise to a status of agency for them. They had contractual obligations to go out and try to put the boats to work, and then they had certain obligations within the context of the Master Variable Charter Agreement. Those were their obligations. I don't think they have a fiduciary obligation or a fiduciary status. They had a simple contractual arrangement, and there were certain things they were supposed to do. What did ATEL know about Seymour's business when they entered into this contract? I mean, did they enter into the contract thinking that Seymour did very well because of what were, in effect, neighbors' relationship with these oil companies? The testimony established that what they knew about the business of Seymour was gathered from these visits. Gathered from these visits that Mr. Monroe made and then some communications over the phone from San Francisco by Mr. Moran. So I don't know what was represented to them or what their ultimate decision or understanding as to how Seymour did, other than that they were extremely satisfied with the utilization rates. So they were apparently what they could gather on a visit or two to our facility in New Liberia. Can I touch for just a minute on the single business enterprise alter ego? He just said it didn't make a difference which one he used. Well, my only point is the facts are clear. The judge's facts that she found established, and there's some great language about that if I'm going to take two seconds, that the presumption... I'm briefing about whether it was single business versus alter ego, but your opponent has said it doesn't make a difference which one you choose. I mean, they would say it was single business and alter ego, but I'm saying the distinction between the two theories apparently isn't at issue here. You all say you weren't this blob, and they're saying you were. Whatever that blob is called. It summarizes that particular argument. Yes, Your Honor. Okay. What else did you have? I don't think there's another huge difference. Well, I guess I'd like to answer any questions. Anybody, if you have something in particular about the contract or the theories as against Neighbor's Will Services or the fraud. You are not required to use all of your time. You're welcome to, but you're not required. I just don't want to miss anything that's of interest to you all. That's totally fair, and if we have questions, we'll sure ask them. Is there anything else of interest to you? I must have done everything. It's of interest, but I don't have any questions. All right. Get a heck of a job in eight minutes. All right. Thanks. Thank you, Your Honor. Honor. Thank you. Can I have his extra six and a half? No, don't work that way. You get your five. Thank you. They're going to hit that soon. There we go. All right. Thank you. Your Honor, in brief rebuttal, or at least as brief as I can be, a number of points directed to some of your questions and the argument. To the argument that CMAR didn't know how Neighbors Welfare Services made its money. Well, there was testimony specifically that Van De Witt, the president of Neighbors Welfare Services, specifically told Neighbors Welfare Services employees, do not discuss these higher rates with members of CMAR management and ATEM. So if there's a lack of knowledge, it was because it was specifically directed by the president, Van De Witt. Secondarily. And he told them not to discuss it with CMAR. Correct. All right. Now, Plaisance himself, though, said he had received this paperwork, he had his suspicions, he heard this 10% skimming scheme discussed at a board meeting, yet he, Plaisance, wearing the CMAR management hat, never disclosed any of that to ATEM. But it doesn't matter what CMAR represented on a phone call when it solicited the business from ATEM. What matters is what CMAR contractually obligated itself to do. And under the specific plain language of the agreement, CMAR had these obligations, which they clearly breached. They had an obligation to do what? To account for all revenues, for all time charters to be in CMAR. CMAR accounted for the revenues that CMAR got. I mean, so the problem that you have is that the one potential breach of contract, not disclosing what neighbors was getting, isn't tethered to the damages you want to recover. What's tethered to the damages you want to recover is that they're entitled to subcontract, they're entitled to contract out to neighbors, and they did disclose to you what they got, and that's what they got. And if your single business enterprise or blob theory goes out the window, then that's it. As a matter of fact, they, whether CMAR management or neighbors well services, never disclosed this additional 10 percent of revenues. Right. I understand that. But the problem to me with the failure to disclose is I don't think that gets you $2.8 million or whatever it is you're trying to get. That gets you we would have, could have, should have dumped the contract sooner, and then you'd be back sitting there with your boats on the dock. Because I tend to agree that if the day after you guys are done with this contract, your boats are sitting idle, that that can't really be explained by the economy, et cetera. Two points with that. First of all, the day after CMAR decided to get out of the business in Hornbeck, first it's worth noting that the rates that HL was getting automatically went up 10 percent. That's because there was no longer any skimming being done. Hornbeck was remitting 100 percent of the revenues being earned by the vessels. And secondarily, Your Honor, that the district court's opinion or the basis of her opinion that the marketing that well services did for the $2.8 million was this other service, this marketing service that they were allowed to do under the terms of the contract, that fails. Because that section upon which the district court relied was Section 13. Section 13 specifically stated that in addition to performing services for which CMAR Management will receive management fees, CMAR Management may perform other services and bill ATEL for them. Well, Section 6Bi specifically stated that CMAR Management was receiving its management fee for services including marketing for bidding, solicitation, bidding and negotiation of the time charters. The marketing of the vessels could not be an other service since CMAR Management was already being paid for it. So back to your original point, Judge Graves, was that the court recognized, the district court recognized that ATEL paid CMAR Management to market the vessels and then ended up paying an additional 10 percent, $2.8 million, to Neighbors Well Services performing the exact same services, which is the consignment example. The difficulty with that is in a consignment situation there's knowledge. The person that's buying it, that's spending the money, knows what's going on. It's clear here, Your Honor, ATEL was intentionally kept in the dark about what was taking place. And because ATEL was kept in the dark both by CMAR Management and then directly by Neighbors Well Services, ATEL suffered these damages of a clear 10 percent of the amount that its vessels were earning, which it was entitled to under the contract between CMAR Management and ATEL. Any further questions, Your Honor? Thank you very much. Thank you so much. We appreciate that. And this will conclude our arguments for today. We will resume this session of the Fifth Circuit tomorrow afternoon.